IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

STEVEN DOSS,

      Petitioner,               Case No. 2:06-cv-00723 ALA (HC)

  vs.

D.K. SISTO, et al.,<sup>1</sup>               ORDER

      Respondents.

_____/

    Pending before the Court are Steven Doss's ("Petitioner") application for a writ of habeas corpus pursuant to 28 U.S.C. §2254(a) (doc. 1), Respondent's Answer (doc. 11), and Petitioner's Traverse (doc. 15). Also before the Court are the parties' supplemental briefs filed in response to this Court's December 19, 2007 order requesting additional briefing on the applicability of *Irons v. Carey*, 505 F.3d 846 (9th Cir. 2007), if any, to this matter. For the reasons discussed below, Petitioner's application is denied.

**I**

**A**

    Pursuant to a plea agreement, Petitioner entered a guilty plea to one count of kidnapping

---

[1] D.K. Sisto is substituted for his predecessor, Tom Carey, as the warden where the prisoner is incarcerated, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

1 for the purpose of robbery in violation of California Penal Code section 209.  On motion of the
2 District Attorney, the remaining counts and the use of a weapon allegations were dismissed in
3 the interest of justice.  He was sentenced on May 27, 1981, to serve a sentence of life with the
4 possibility of parole.  During the *sentencing* proceedings, the Court recommended that
5 "assuming his record in prison is good, he be released at the earliest time possible."  Petitioner
6 did not file a direct appeal from the judgment of conviction.

**B**

The probation report prepared for the trial court's sentencing proceedings described Petitioner's crime as follows:

> Criminal Record:
> SUMMARY OF OFFENSE:
> The victim, Hyung Cho, and his wife, Yung Cho, and their two children were at the foot of Seventh Street; Hyung was fishing while his wife and children got in the car.  Hyung was approached by the defendant and co-suspect and was asked for directions to a gas station.  A few minutes later Hyung heard his wife screaming, turned around and saw the defendant in the back seat of Hyung's car with a knife to the throat of his wife.  Hyung ran to the car, simultaneously throwing away a fishing knife he had in his hands (for fear of potential injury).  When the defendant put the knife to Yung's throat she apparently tried to push it away and cut her hand in two places.  The defendant and Yung exited the car.  Both the defendant and co-suspect warned Hyung that if he followed orders, no one would be hurt.  The defendants took Hyung's wallet, removing cash and credit cards.  Both defendants then tried to siphon gas from Hyung's car with a hose.  While one was doing that, the other would restrain the victims.  Not satisfied with that, the defendant made Hyung drive with him to a gas station while the co-suspect held Yung and the children at the original scene.  At the gas station the defendant made Hyung buy gas with one of Hyung's credit cards.  Upon return to the original scene, the defendants told the victims that they would now have to go to the victims' house so that the victims would not call the police if the defendants knew where the victims' house was located.  Hyung was driven in the defendant's car by the defendant while Yung and the children were driven in the Chos' car by the co-suspect.
>
> When they arrived at the house the victims went into the house first and managed to shut and lock the door on the defendants who pushed and pounded in an attempt to get in and then they left.
>
> Victim Yung speaks Korean only and victim Hyung speaks

> adequate English.  Hyung begged continuously for the safety of his family and was told several times to do as ordered or suffer harm. During the incident at the original scene Yung overheard Doss tell co-suspect, "First I'm going to fuck her and then you're going to fuck her."

## II

On July 7, 2004, the Board Of Prison Terms ("BPT") concluded that Petitioner was not suitable for parole because he would pose an unreasonable risk of danger to society or a threat to public safety if released from prison.  Petitioner filed a petition for a writ of habeas corpus before the Alameda County Superior Court challenging the BPT's July 7, 2004 decision.  The Alameda County Superior Court denied his petition on October 4, 2004.

The Alameda County Superior Court's order reads as follows:

> Petition for writ of habeas corpus is denied.  Petition fails to state a prima facie case for relief.  Even though Petitioner has submitted numerous documents in support of his Petition, review of the transcript and documents pertaining to the July 7, 2004, hearing, indicate that there was no abuse of discretion by the Board of Prison Terms.  The record presented to this Court for review demonstrates that there was certainly some evidence, including, but not limited to the committing offense, and Petitioner's participation in rehabilitation programs, to support the Boards' decision.  There is nothing in the record that indicates that the Board's decision was arbitrary or capricious, nor that Petitioner's equal protection or due process rights were violated.  Thus, Petitioner has failed to meet his burden of sufficiently proving or supporting the allegations that serve as the basis for habeas relief.

Petitioner filed a petition for a writ of habeas corpus before the California Court of Appeal for the First Appellate District.  That court summarily denied the petition on January 19, 2005.  Petitioner filed a petition for review before the California Supreme Court.  That court summarily denied the petition for review on April 20, 2005.  Petitioner filed an application for a writ of habeas corpus in this Court pursuant to 28 U.S.C. §2254(a) on April 24, 2006.

## III

### A

Petitioner contends in his application for a writ of habeas corpus that he is entitled to

relief on discrete grounds. He alleges that the BPT violated his federal constitutional rights under the Eighth and Fourteenth Amendments because the BPT did not base its decision on some evidence demonstrating that he was unsuitable for release on parole. He also asserts that the denial of parole release violated his sentencing agreement.

An application for a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "shall not be granted with respect to any claim that was adjudicated on the merits" in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d).

**B**

Citing Ninth Circuit authority, Petitioner contends in his application that this Court has jurisdiction over this matter because a California prisoner has a liberty interest in being released on parole under California law that is protected by the Due Process Clause of the Fourteenth Amendment. In his answer to the application, Respondent maintains that this Court may not grant Petitioner's application pursuant to §2254(d) because the state court's denial of habeas corpus relief was not contrary to clearly established Federal law, as determined by the Supreme Court of the United States. Respondent contends that no decision of the United States Supreme Court has held that a state prisoner has a federally protected interest in release on parole under California Penal Code §3041. This contention is contrary to the Ninth Circuit's decision in *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d, 1123, 1127-28 (9th Cir. 2006). This Court must reject Respondent's contention under compulsion of Ninth Circuit precedent that provides that "California's parole scheme gives rise to a cognizable liberty interest in release on parole." *Id.*

4

1  at 1127 (citation omitted).

2  In his response to this Court's December 19, 2007 Order for supplemental briefing
3  regarding the applicability if any, of *Irons v. Carey*, 479 F.2d 658 (9th Cir. 2007) to this matter,
4  Respondent argues that because the Supreme Court has never applied the some evidence test to a
5  parole decision, this Court is not required to follow *Irons* in disposing of this application.

6  In *Superintendent v. Hill*, 472 U.S. 445, 454 (1985), the Supreme Court held that
7  "revocation of good time does not comport with 'the minimum requirements of procedural due
8  process,' unless the findings of the prison disciplinary board are supported by some evidence in
9  the record." (Citation omitted).  This Court is bound by the Ninth Circuit holding that *Hill*'s
10 some evidence standard applies to parole release proceedings.  *Sass*, 461 F.3d at 1128-29; See
11 *Irons*, 505 F.3d at 851 ("the Supreme Court ha[s] clearly established that a parole board's
12 decision deprives a prisoner of due process with respect to this interest if the board's decision is
13 not supported by 'some evidence in the record,' . . . or is 'otherwise arbitrary'").

14 This Court cannot contravene that holding.  *See Zuniga v. United Can Co.*, 812 F.2d 443,
15 450 (9th Cir. 1987) (citation omitted) ("District courts are, of course, bound by the law of their
16 own circuit, and 'are not to resolve splits between circuits no matter how egregiously in error
17 they may feel their own circuit to be.'").  Therefore, this Court must reject Respondent's
18 argument that the some evidence standard does not apply.

19 Petitioner also argues that the BPT's decision was not supported by some evidence
20 because it was based solely on the nature of Petitioner's commitment offense.  He claims that
21 *Irons* stands for the proposition that a due process violation will result if parole is denied based
22 on "an unchanging factor, the circumstances of the offense and conduct prior to imprisonment."
23 He alleges that *Irons* did not grant habeas relief despite the due process violation because the
24 petitioner in that case had "not yet served the minimum time required for the offense."

25 In *Irons*, the Ninth Circuit held that

26 where, as here, there is some evidence to support a finding that

5

> "the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering" and the "motive for the crime is inexplicable or very trivial in relation to the offense," Cal. Code Regs., tit. 15 § 2402(c)(1)(D)-(E), we cannot say that the state court unreasonably applied *Hill*'s "some evidence" principle.

*Irons*, 505 F.3d at 853.

In *Irons*, the record showed that the BPT relied on the commitment offense in determining that the prisoner was not suitable for release on parole. *Id.* at 852.

The Ninth Circuit limited its holding in *Irons* as follows: "All we held in [*Sass*, 461 F.3d at 1125 and *Biggs v. Terhune*, 334 F.3d 910, 912 (9th Cir. 2002)] and all we hold today, therefore, is that, given the particular circumstances of the offenses of these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." 505 F.3d at 853-54.  In an unusual comment in *Irons*, the panel expressed its aspiration that some future court decision will conclude that the BPT has the duty to grant parole where "there was substantial evidence in the record demonstrating rehabilitation." *Id.* at 854.

The Court stated:

> We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes.

*Id.*

The *Irons* panel did not cite any authority to support its prognostication that the denial by the state court of habeas corpus relief, under such circumstances, would be "contrary to, or involve[] an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States" in violation of 28 U.S.C. §2254(d)(1).  No presently binding Ninth Circuit decision has fulfilled the prediction of the *Irons*'s panel.

In the precedential portion of the *Irons* decision, the Court held that "we must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for

6

1  parole, and then must review the record in order to determine whether the state court decision
2  holding that these findings were supported by 'some evidence.'" *Irons*, 505 F.3d at 851.  A
3  prisoner's commitment offense, on its own, may justify parole denial if "the Board can 'point to
4  factors beyond the minimum elements of the crime for which the inmate was committed' that
5  demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if
6  released." *Id.* at 852 (quoting *Dannenberg*, 34 Cal. 4th 1061,1071 (2005)).  An offense
7  committed in an especially heinous, atrocious or cruel manner is a factor tending to show
8  unsuitability for release.  Cal. Code. Regs., tit. 15 § 2402(c)(1).

9  Based on controlling Ninth Circuit authority, this Court must determine whether some
10 evidence supported the BPT's July 7, 2004 decision to deny a release on parole to Petitioner.

**IV**

The BPT's decision reads as follows:

> **PRESIDING COMMISSIONER WELCH:** Okay, sir, we have a decision. Now we will tell you whether we're going to set a date a not. The Panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. So since we didn't find you suitable for parole, sir, we will not be setting a date. But I'll try to articulate to you why we found you unsuitable for parole. First, the offense was carried out in an especially cruel and callous manner. Multiple victims were involved in this offense. The offense was carried out in a dispassionate manner. The motive for the crime is inexplicable. These conclusions were drawn from the Statement of Facts wherein on August 24, 1980, the prisoner approached the victim, in fact, it was husband and wife and two children, the Chos. The prisoner under ruse of, well actually the victim, Mr. Cho, was fishing with his wife in Oakland, Mr. Cho was approached by the prisoner and his crime partner and asked for directions to a gas station. A few minutes later Mr. Cho heard his wife screaming and turned and saw the prisoner in the back seat of with a knife at his wife's throat. The bottom line is that subsequently the prisoner and his crime partner had taken the victim to a gas station to buy gas. Then after that they drove to the victims' home in two separate cars. However, the victim was able to get into the house and secure the door before and the prisoner ran way along with his crime partner. The prisoner did have somewhat of an escalating pattern of criminal conduct if you

7

take into consideration his military history, his court martial (indiscernible) in the military and on the rap sheet (indiscernible) arrest for malicious mischief slash vandalism. The prisoner failed to profit from the court martials he received in the military to correct his behavior. An unstable social history. Certainly his service to his country was a not a desirable social factor. Also, his involvement in the use of drugs is certainly not a desirable social trait. Programs. In recent times the prisoner has made some progress. He hasn't received a disciplinary in quite some time so his progress in, this progress in prison has improved. However, he has not completed his vocational program. He has made some progress in that area. He has not sufficiently participated in self-help programs, substance abuse programs. The recent Psychological Report shows that the prisoner is making some progress, shows that his level of dangerousness, both in a structured and unstructured environment, it appears to be low. However, we are requesting a new Psychological Evaluation because we do have some concerns and we're requesting a new Psychological Evaluation be completed. The last one was an update on 9/19/01. Before that was the 10/14/99 Psychological Evaluation. Both of these was completed by, one was completed by Dr. Beermann, and the update was by Dr. Macomber. So we're requesting a Psychological Evaluation. The prisoner does have - - First of all, let me say this. The prisoner does have some parole plans. He has some support. However, the prisoner does not have suitable parole plans for the State of California. He does not have residential plans in the State of California, does not have acceptable employment plans for the State of California. He has support in other states. The Hearing Panel notes that in response to Penal Code 3042 Notices indicate opposition to a finding of suitability. Specifically, the Deputy District Attorney from Alameda County spoke in opposition. The Panel makes the following findings. The prisoner needs to continue to participate in positive kinds of programs, self-help programs, and other types of programs. especially self-help programs, the kind that would enable him to face, discuss, understand, and cope with stress in a non-destructive manner. Until enough progress is made there are still some concerns about the prisoner being a threat to others, or risk predictability. Nevertheless, there are some things we want to commend him for. It has been some time since he received a disciplinary. We think that's commendable. We want to commend him for the portions of his vocational program that he has completed. We think that's commendable. And certainly for the other activities that he participated in (indiscernible) his job as a clerk, in his clerking position. All of those are commendable traits. However, those positive aspects of his behavior does not outweigh the factors of unsuitability. The prisoner's parole is going to be denied for one year. The Panel recommends that one, during that year that the prisoner continue to certainly participate in self-help programs. Those self-help programs should also be a part of his parole plans, especially the substance abuse kind since alcohol played a major

role, substance played a major role in the crime, and also played a role in his discharge from the military and prior criminal history. So certainly we think that substance abuse should be a part of his - - Continue to participate in vocational programming and complete all phases of his welding program if possible. We are requesting a new psychological evaluation. We're requesting that the prisoner's violence potential in the free community be explored, the significance of alcohol and drugs as it relates to the commitment offense, and certainly the extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes. Commissioner, any comments?

**DEPUTY COMMISSIONER DININNI:** I have one correction for the record. The district attorney's opposition was by letter. It wasn't spoken in person.

**INMATE DOSS:** Thank you.

**DEPUTY COMMISSIONER DININNI:** And I commend you for your program. It sounds like you're well on the way to completing the vocational welding, and I recommend that you participate in some type of alcohol abuse program.

**INMATE DOSS:** So my understanding is that you feel that if I take some more self-help groups, and get a place to stay in California, that's all that's left to get a parole date? Because I can't change the crime, and I'm sorry I can't change the crime, but how long am I going to be punished for the crime?

**PRESIDING COMMISSIONER WELCH:** Okay, what I did say, what I'm trying to say to you, what we're trying to convey to you is this. Is that you need to cross all the T's and dot the I's. There are certain things that you need to do. You need to have a place to stay. You need to demonstrate that you have the kinds of programs in place to ensure that you don't get involved in substance abuse that would lead you to committing another crime or you getting involved in (indiscernible), that you should make parole, that you should make substance abuse a part of your, an extension of your parole plans. And I'm telling you the areas that you have not solidified, your parole plans is not solidified. Your substance abuse participation is not solidified. Your vocational program has not yet been solidified. You need to have all these things solidified and then you will be more competitive for a parole date than you are now. I hope that explains its.

**INMATE DOSS:** I'll bring those back next year on the condition that if I parole and attend self-help groups and I complete the program, all that, and if I fail them I won't get a date, but if I can prove all these things –

**PRESIDING COMMISSIONER WELCH:** You're not a very

good listener.

**INMATE DOSS:** No, I understand it. I will - -

**PRESIDING COMMISSIONER WELCH:** Be quiet and let me tell you. What I'm trying to tell you, how to be more competitive for a parole date.

**INMATE DOSS:** More competitive.

**PRESIDING COMMISSIONER WELCH:** And I'm telling you this, you need to complete these things so that you'll be competitive, so that you'll be very competitive for a parole date. And you need to have all these things in place, and you need to be able to listen. That's what I'm trying to tell you. You have not put all the things in place that you need to have in place.

**DEPUTY COMMISSIONER DININNI:** We can't forecast what another Panel would (indiscernible) in deliberation is whether it would pose a reasonable or an unreasonable risk to commit another crime, okay. At the point in time of this crime you were in a somewhat desperate situation, you didn't have a place to stay, it looks like you might have had a stolen car, you ran out of gas, you needed some resources, and that's what led to this crime. You were using alcohol. So reasonable or unreasonable risk, what we were talking about in deliberation, is what was then and what was now. The crime happened a long ago. But the situation would seem like it would be quite similar if you don't have a place to stay, don't have employment, any you don't have any self-help. It just makes it unreasonable for us to go there. So if we make a decision that you are suitable, that's how we would put on our decision, that hey, that was a long time ago. In the meantime, no disciplinaries since such time frame, AA, and these are the parole plans. But we can only speak to this Panel.

**INMATE DOSS:** So going out there and getting married and then attending a self-help group counts for nothing. I understand, no, I understand.

**DEPUTY COMMISSIONER DININNI:** Good luck to you, sir.

**V**

**A**

Petitioner contends that he is entitled to be released on parole because he pled guilty based upon his agreement with the prosecutor that the trial court would recommend that he be released on the earliest possible date assuming his good behavior in prison. His reliance on *Brown v.*

10

1  *Poole*, 337 F.3d 1155 (9th Cir. 2003) for this proposition is misplaced.  In *Brown*, the record
2  showed that the prosecutor promised the defendant that she would serve only half of a fifteen or
3  seventeen year sentence if she gave up her right to a trial by jury and entered a plea of guilty.  *Id.*
4  at 1161.

5       Here, unlike the circumstances in *Brown*, Petitioner was not promised that she would be
6  released on parole at the earliest possible time in exchange for his guilty plea.  During Petitioner's
7  sentencing proceedings, the trial court stated:

> In accordance with the negotiated disposition, for kidnapping, for robbery, he's committed to state prison for life with possibility of parole.  The Court will recommend that he be placed in a minimal security institution.  The Court will recommend that he be released on parole assuming his record in prison is good; he be released at the earliest time possible.

12  In his traverse, Petitioner concedes that "the sentencing transcript contains no promise of parole."
13  Petitioner's traverse at page 3.

14       Thus, unlike the circumstances in Brown, Petitioner's plea agreement was not conditioned
15  upon a promise by the prosecutor that he would be released on parole at the earlier possible time.
16  Instead, Petitioner entered his guilty plea in this matter based on the promise that the trial court
17  would recommend his early release on parole.  The trial court did so.  Accordingly, Petitioner
18  received specific performance of that promise.  The BPT was not required to follow the trial
19  court's recommendation and ignore its statutory duty to determine Petitioner's suitability for
20  release on parole.

21                           **B**

22       Petitioner contends that the BPT"s July 7, 2004 decision that he was unsuitable for release
23  on parole based on his commitment offense denied him his right to Due Process under the
24  Fourteenth Amendment.  He cites *Biggs v. Terhune*, 334 F.3d 910 (9th Cir. 2003) for the
25  proposition "that parole denial beyond the [Minimum Eligible Parole Date] cannot be based on
26  the offense or prior conduct."  Application for Writ of Habeas Corpus at page 39.  In fact, *Biggs*

11

expressly holds to the contrary. The Ninth Circuit *affirmed* the denial of a parole release in *Biggs* stating: "Section 3041(b) allows the gravity of the offense to be considered in requiring a period of longer incarceration. The murder of which *Biggs* was convicted involved killing a witness in a manner which exhibited a callous disregard for life." *Id.* at 916.

Petitioner's contention that the BPT cannot base its decision on the commitment offense is contrary to California Penal Code section 3041(b). Section 3041(b) provides that the BPT

> "shall set a release date unless it determines the gravity of the offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."

The BPT declined to set a release date because "the offense was carried out in an especially cruel and callous manner. Multiple victims were involved in this offense. The offense was carried out in a dispassionate manner. The motive for the crime is inexplicable."

California Code of Regulations §2281 sets forth the circumstances that tend to show unsuitability for parole release. Section 2281(c)(1) provides as follows:

> (1) Commitment Offense: The prisoner committed the offense in an especially heinous, atrocious or cruel manner.
> The factors to be considered include:
>
> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
> (C) The victim was abused, defiled or mutilated during or after the offense.
> (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
> (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

The probation officer's report considered by the BPT demonstrated that Petitioner's commitment offense of kidnapping for the purpose of robbery was carried out in an especially cruel manner. While the adult male victim was asked for directions to a gas station, his wife was detained in the back seat of his car by the Petitioner. He held a knife to her throat. Her hand was

1  cut in two places while she struggled with Petitioner to push the knife away.  During this assault,
2  Petitioner told his accomplice "First I'm going to fuck her and then you are going to fuck her."
3  This attack on the adult female victim occurred in the presence of her two children.

4        Petitioner and his crime partner removed the cash and credit cards from the adult male
5  victim's wallet.  After failing in their efforts to siphon gasoline from the victims' vehicle,
6  Petitioner forced the adult male victim to drive him to a gas station to purchase gasoline with the
7  adult male victim's credit card.  Petitioner and his accomplice then drove the victims to their
8  home so that they would not call the police because their kidnappers would know where they
9  lived.  This statement was obviously intended to create fear in the victims that they would be
10 harmed or killed if they reported the crimes committed by Petitioner and his cohort.  At the
11 victims' residence, Petitioner and his accomplice attempted to enter the residence.  This attempted
12 entry was calculated to further frighten and menace their victims.  Petitioner's conduct goes far
13 beyond the minimum elements required to prove the crime of kidnapping for robbery.

14       The record clearly demonstrates that the BPT's finding that Petitioner's crime was carried
15 out in an especially cruel and callous manner is supportive by some evidence.  Petitioner attacked
16 multiple victims.  *See* §2281(c)(1)(B).  The adult female victim threatened with death by placing
17 a knife to her throat.  *See* §2281(c)(1).  She heard her tormentor state he and his crime partner
18 were going to rape her.  Petitioner's threat of sexual violence was made in a manner that
19 demonstrated an exceptionally callous disregard for human suffering.  The motive for the crime of
20 kidnapping for the purpose of robbery, i.e., to obtain gasoline for Petitioner was trivial in relation
21 to Petitioner's callous treatment of his victims.

22       The BPT also properly considered Petitioner's escalating criminal conduct prior to the
23 commission of the commitment offense that led to his bad conduct discharge from the military.
24 The BPT also was mindful of the fact that Petitioner was abusing drugs and alcohol prior to his
25 commitment offense.  The record shows that the BPT considered the circumstances set forth in
26 §2281(d) that tend to show suitability for parole release including the fact that Petitioner had not

13

been charged with a disciplinary infraction in some time and his progress in prison had improved. The BPT also commended him for the portions of his vocation program that he has completed. The BPT concluded, however, that "those positive aspects of his behavior does (sic) not outweigh the factors of unsuitability." "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant test is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.'" *Sass*, 461 F.3d at 1128 (*quoting Hill,* 472 U.S. at 455-56). "Hill's some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary.'" *Id.* at 1129 (*quoting Hill,* 472 U.S. at 457).

## Conclusion

The BPT decided not to set a release date because it considered that the cruel nature of Petitioner's crime continues to pose a risk of danger to society if he is set free. This finding outweighs the fact that he has performed well while confined under twenty-four hour supervision by prison guards. Thus, the BPT's decision is supported by some evidence.

For the same reason, the decision of the Alameda County Superior Court denying Petitioner's state habeas corpus petition was not "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §2254(d).

It is therefore hereby ORDERED that Petitioner's application for habeas corpus relief is DENIED.

/////
DATED: June 13, 2008

/s/ Arthur L. Alarcón
_____
UNITED STATES CIRCUIT JUDGE
Sitting by Designation